**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
---------------------------------------------------------X

In Re:

GEOFFREY M. SANTINI,

                              Debtor.
---------------------------------------------------------X
BENJAMIN GIUNTA,

                              Plaintiff,

- against-

GEOFFREY M. SANTINI,
,

                              Defendant.
---------------------------------------------------------X

CHAPTER 7

Case No.: 05-16282 (RG)

Ad. Pro. No. 05-1907 (MBK)

APPEARANCES:

Joseph E. Collini, Esq.
Emolo & Collini, Esqs.
375 Broadway
Paterson, New Jersey 07501
Attorney for Plaintiff, Benjamin Giunta

Stanley W. Low, Esq.
Low & Low, Esqs., LLC
505 Main Street, Suite 304
Hackensack, New Jersey 07601
Attorneys for Defendant, Geoffrey M. Santini

**MICHAEL B. KAPLAN, U.S.B.J.**

**MEMORANDUM DECISION**

## I. JURISDICTION

The court has jurisdiction over this contested matter under 28 U.S.C. § 1334(a) and 157(b) and the Standing Order of the United States District Court dated July 10, 1984 referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a). The statutory predicate for the relief sought herein is 11 U.S.C. § 523(a)(2)(a)[1]. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.[2]

## II. FACTS AND PROCEDURAL HISTORY

1. Plaintiff, Benjamin Giunta ("Giunta") is related to Debtor/Defendant, Geoffrey Santini ("Santini") through Giunta's sister's marriage to Santini's half-brother, Vincent Gazillo ("Gazillo").

2. On December 3, 1999, Giunta was arrested and detained in the Passaic County Jail.

3. As a condition to Giunta's release, bail was set at $150,000.

4. Giunta contacted Santini, who owned a bail bond business, Allstate Bail Bonds, to obtain a bond for release from jail.

---

[1] Absent contrary indication, all "Code," chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 as amended by the Bankruptcy Abuse Prevention and Consumer Prevention Act of 2005 ("BAPCPA"), Pub. L. 109–08, 119 Stat. 23. "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "FRCP" and "FRE" references are to the Federal Rules of Civil Procedure and the Federal Rules of Evidence, respectively.

[2] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

5. Santini agreed to assist Giunta and did so on December 3, 1999. However, because the amount exceeded the sum Santini was authorized to bond in New Jersey, he had to go outside the state for bonding coverage.

6. The bond was approved by American Safety Casualty Insurance and necessitated Santini's travel to New York to physically secure the bond.

7. Giunta was released from jail and Santini drove him home. In his testimony, Santini did not recall what they had discussed, if anything, during the drive.

8. On or about December 8, 1999, Giunta, Gazillo and Santini met at Santini's office. At the meeting, Giunta paid Santini the $14,000 fee for the bail bond. In addition, because Santini had gone out of his way to help him, Giunta gave Santini an additional $3,500 as a bonus.

9. During the December 8, 1999 meeting, Santini asked Giunta, a mortgage broker, how he could obtain a second mortgage on his home. In turn, Giunta inquired about Santini's motivation for seeking the mortgage.

10. Santini related his desire to start a bail bond business in the State of New York, which he maintained could be more profitable than the New Jersey office. Santini indicated that he would need approximately $100,000 to obtain the bond required under state regulations to start the business.

11. Giunta offered to provide Santini with the necessary funds and to become a partner in the business; Santini accepted Giunta's offer.

12. No terms of the transaction were discussed or memorialized in any writing. Instead, Giunta simply gave Santini a check for $97,000, with instructions not to deposit the check until Giunta advised him that he could do so.

13. At that time, both men contemplated that Santini would use $3,000 of the $3,500 bonus he had received previously from Giunta towards the $100,000 necessary to secure the bond.

14. Contrary to instructions, Santini did not wait for Giunta's approval and deposited the check on or about December 10, 1999.

15. On December 15, 1999, the check was returned unpaid for insufficient funds.

16. On December 20, 1999, Giunta wired $100,000 to Santini via the business account for All State Bail Bonds.

17. Giunta waited thirty (30) days before he contacted Santini for an update on the progress as to the formation of the New York business. Giunta attempted to communicate with Santini a number of times, without success.

18. At one point, in early February, Giunta, along with Gazillo, went to Santini's home, where he spoke to Santini's wife, Jennifer, in an attempt to elicit information about his investment. These efforts also yielded no results.

19. Giunta contacted Gazillo several more times, inquiring of Santini's whereabouts. Despite Gazillo's urging, and the urging of Giunta's sister, Aldagisa, Santini was unresponsive to any of Giunta's attempts to engage in a discussion.

20. Finally, in late February of 2000, Gazillo successfully contacted Santini and arranged a meeting at a Dunkin Donuts shop in Secaucus, New Jersey.

21. At the meeting, Gazillo remained by the car while Santini and Giunta spoke about the status of the bail bond business in New York and the funds Giunta had invested with Santini.

22. Santini advised Giunta that he was still working to establish the new business, but it was taking longer than expected due to certain personal issues confronting Santini. Santini

further indicated that he had completed an application for the license and had made a contact in North Carolina.

23. Giunta asked for a copy of the application and Santini agreed to provide same immediately but needed to go to his office in Jersey City. With Gazillo in his car, Giunta followed Santini to his office.

24. At Santini's office, Giunta was provided with a business card for the contact in North Carolina and a blank copy of an application.

25. Giunta contacted the individual on the business card, but was rebuffed in his efforts to obtain any information on the status of the application which Santini claimed he had filed.

26. Once again, Giunta tried numerous times unsuccessfully to contact Santini.

27. On March 14, 2000, Giunta filed a criminal complaint alleging theft by deception for the $100,000 advanced to Santini.

28. Santini was indicted on August 1, 2000 and acquitted after a jury trial on January 16, 2003.

29. In addition to the criminal complaint, Giunta filed a civil complaint for conversion in the Superior Court of New Jersey on May 15, 2000.

30. Santini failed to answer the complaint and Giunta obtained a default judgment (the "Judgment") in the amount of $103,000 against Santini on October 18, 2004.

31. On March 3, 2005, Santini filed a petition for relief under Chapter 7 of the United States Bankruptcy Code.

32. On June 2, 2005, Giunta filed in the Bankruptcy Court an adversary complaint seeking to declare the debt owing by Santini to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

33. Santini filed an Answer to the Complaint on August 16, 2007.

34. The parties appeared for trial on March 5th and 6th, 2009. Notwithstanding, the trial was continued to April 8, 2009, in order to finish Santini's testimony.

35. On April 8th, 2009, the day the trial was to resume, Santini did not appear.[3] The parties completed the presentation of their cases.

### III.  OPINION

Giunta asserts that the Judgment represents a debt arising from Santini's misrepresentation regarding his intent to use the funds infused by Giunta to start a bail bond business in the State of New York. Giunta argues that Santini obtained the money under false pretenses, a false representation and/or actual fraud on which Giunta reasonably relied and, as such, pursuant to 11 USC § 523(a)(2)(A), the Judgment is nondischargeable. Santini testified that he had expressed an interest in expanding his business into New York and other profitable areas besides the existing Jersey City office and that the money obtained from Giunta was intended for that purpose. It is clear from the record that notwithstanding Santini's representation to Giunta that he needed the money to expand his business, the funds were, in fact, used for other purposes. The Court finds from Giunta's credible testimony and documentation introduced into evidence (primarily Santini's cancelled checks from his business account) that the funds were not used for the purpose of capitalizing a New York office; rather, a substantial portion of the funds were used to refund pre-existing bail deposits and outstanding business/personal obligations. It is equally clear that Giunta did not provide the finds with the intent of making a loan to assist Santini in resolving his financial plight; rather, Giunta's unequivocal intent was to

---

[3] The Court notes that Santini's proffered reason for failing to appear on the last trial date proved to be spurious and, as a consequence, further undermines his credibility in the eyes of the Court.

6

become a partner with Santini in a new profitable venture. Accordingly, the Court finds that the Judgment is nondischargeable as it was obtained by false representations and under false pretenses.

> 11 USC §523 (a)(2)(A) states:
>
> > (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-
> > > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by
> > > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

As in all § 523 cases, the burden of proof is on the creditor to show all of the elements of § 523(a)(2)(A) by preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 288-89 (1991). Section 523(a)(2)(A) requires justifiable, but not reasonable, reliance. Field v. Mans, 516 U.S. 59 (1995) (citing In Re Vann, 67 F.3d 277 (C.A. 11th Cir. 1995). "Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than of the application of the community standard of conduct to all cases." Id at 70-71 (quoting Restatement (Second) of Torts § 545A, comment b (1976)). Reliance can be justified even though the plaintiff could have ascertained the falsity of the representation if the plaintiff had investigated. That is not without its limits, however, as the Court in Fields explained, "one must use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Id. Courts have found that reliance based solely upon the close, family relationship between parties is justified and reasonable. See In Re Young,

7

208 B.R. 189 (S.D. Cal. 1997) (*rev'd on other grounds*, 1997 WL 101743 (S.D. Cal. March 6, 1997).

The statute provides three options for proving a debt nondischargable: "false pretenses," "false representations," or "actual fraud." Courts have held that "the use of the disjunctive 'or' demonstrates they embody somewhat different concepts." In re Hambley, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005). See also, In re Soliz, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996) ("The use of the disjunctive 'or' evidences that Congress intended to deny a discharge under any one of the three types of mischief referred to."); In re Marc Levanthal, 194 B.R. 26, 28 (Bankr. S.D.N.Y. 1996) ("Section 523(a)(2)(A) speaks of 'false pretenses, a false representation, or actual fraud,' evidencing a statutory distinction among the three"). Thus, for purposes of this decision, the Court will examine whether the Plaintiff has made out a case under any of the three grounds in § 523(a)(2)(A).

The first avenue is to establish that the debt was incurred by "false pretenses." Courts have defined that term to mean "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property." In re Kovler, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000)). To establish that a debt was incurred by false pretenses, the Plaintiff must establish: "(1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property, or credit to the defendant." In re Hambley, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005).

For a court to find a debt nondischargeable based on a "false representation" the Plaintiff must prove that the Debtor "(1) made a false or misleading statement; (2) with the intent to

deceive; and (3) in order for the plaintiffs to turn over money or property to the defendants." Id. To support a finding of a false representation under § 523(a)(2)(A) it is sufficient to show that the debtor made "false or misleading statement about something, usually with the intent to deceive." In re Dobrayel, 287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002) (citing Black's Law Dictionary 619 (7th ed.1999)).

Finally, for a court to find a debt nondischargeable based on "actual fraud," the Plaintiffs must establish the classic "five fingers of fraud." Dobrayel at 12. That is, the Plaintiffs must prove that: 1) debtor made a material false representation; 2) at the time the debtor knew it was false or showed reckless disregard for its truth; 3) the representation was made with the intent to deceive plaintiff; 4) plaintiff justifiably relied on the representation; and 5) plaintiff sustained a loss as a result of the representation. Field, supra; In re Crim, 149 Fed.App'x. 427, 430 (5th Cir. 2005).

Giunta testified that the impetus for his ultimate transfer of $100,000 to Santini was Santini's expression of interest in developing a bail bond business in New York. Giunta's testimony illustrates that it was his initial curiosity as to the need for Santini to travel to New York to obtain a bail bond in the amount of $150,000 that prompted the conversation whereby Santini informed Giunta that he had a $100,000 limit on bond amounts in New Jersey. Santini further explained that he needed a bond to do business in New York and wanted a second mortgage loan to secure the acquisition of a bond. As Giunta testified, he offered to give Santini the money and did so because of their family relationship.

Santini did not express a need for an infusion of cash to help his existing business, but the record shows that the money was used the money for just those purposes. Santini testified that in April of 2000, about four months after the transfer of $100,000 from Giunta, he had only $1,710

9

in his business account. The record is replete with checks written by Santini indicating that between December and April, Santini issued bail refunds of approximately $60,000, using the funds from Giunta to do so. The checks also evidence that Santini paid utilities, car payments, and $7,000 for the remodeling of his Passaic office. Santini could not remember when he leased the Passaic office, but he did testify that as of December 8, 2000, Santini had only one office in Jersey City. A check for the remodeling of the Passaic office is dated January 15, 2000. Thus, at some point in the month, after Santini had received the money from Giunta, the Passaic office was opened. Santini and Giunta had a specific agreement that the funds were to be used for establishing a New York office, but there is little evidence that Santini made any progress in that regard other than contacting his existing insurance company.

There is absolutely no evidence that Santini expended any of Giunta's money in furtherance of the agreement. Instead, there is ample evidence that Santini did his best to evade Giunta and create the illusion that he was taking steps to open a New York office. This is best illustrated by the meeting at Dunkin Donuts in late February, 2000. Giunta, after several unsuccessful attempts to contact Santini, was finally afforded the opportunity to discuss the status of the funds and the "progress" Santini had made. To assuage Giunta, Santini brought him to his Jersey City office and provided him with a blank copy of an application for a New York bail bond license and a business card for a contact in North Carolina. When Giunta called the contact, the individual refused to speak with him. Santini's conduct was consciously deceptive and calculated to deprive Giunta of his funds.

"Because a debtor rarely, if ever, admits to acting with the intent to deceive, the Court must consider circumstantial evidence concerning the debtor's state of mind at the time of the alleged deception." In re Catherman, 331 B.R. 333 (Bankr. N.D. Ohio 2005). "Because direct

proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." In re Bowden, 362 B.R. 62, 86 (Bankr. E.D. Va. 2005) (quoting In re Van Horne, 823 F.2d 1285, 1287 (8th Cir. 1987). It is clear from the evidence presented that Santini had little to no intention of using Giunta's money to open an office in New York. The minimal amount of work that Santini actually did undertake, coupled with his evasive and misleading behavior, illustrate that Santini held a less than earnest intention of expanding his business into New York. It is obvious that Santini created a fiction for Giunta, on which Giunta reasonably relied, to his own detriment, because of their familial relationship.

## IV.     CONCLUSION

Fore the foregoing reasons, the Court finds that the Judgment is nondischargeable pursuant to 11 USC § 523(a)(2)(A), as it is based upon a debt incurred under false pretenses and by false representations. Plaintiff is directed to submit a form of judgment.

_/s/ Michael B. Kaplan_
Honorable Michael B. Kaplan
United States Bankruptcy Judge